# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --              )
                                        )

General Dynamics Information Technology )    ASBCA No. 60625
                                          )

Under Contract No. W91QUZ-06-D-0025   )

| APPEARANCES FOR THE APPELLANT: | Thomas L. McGovern III, Esq.<br>Nicole D. Picard, Esq.<br>  Hogan Lovells US LLP<br>  Washington, DC |
|---|---|
| APPEARANCES FOR THE GOVERNMENT: | Raymond M. Saunders, Esq.<br>  Army Chief Trial Attorney<br>Dana J. Chase, Esq.<br>  Trial Attorney |

## OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

Appellant, General Dynamics Information Technology (GDIT) was awarded a contract to upgrade the communications network at Fort Drum, New York. During performance of the contract, GDIT's subcontractor severed an existing communications cable duct bank. GDIT appeals from a contracting officer's final decision denying its claim for reimbursement of its costs incurred in repairing the cable strike. GDIT asserts that respondent, the Department of the Army (Army or government) is liable for the repair costs because it failed to mark the existing utility as required by the contract. Conversely, the Army asserts that GDIT is liable for the repair costs because it failed to follow the contractually-required permitting process for excavating on the base. For the reasons stated below, we deny GDIT's appeal.

## FINDINGS OF FACT

GDIT is a business unit of General Dynamics Corporation (compl. ¶ 1). GDIT is the prime contractor under Contract No. W91QUZ-06-D-0025, an indefinite-delivery, indefinite-quantity (IDIQ) contract for the U.S. Army's Infrastructure Modernization (IMOD) Acquisition supporting the Installation Information Infrastructure Modernization Program (I3MP) (R4, tab 35). The IMOD I3MP contract incorporates by reference Federal Acquisition Regulation (FAR) clauses 52.243-1, CHANGES–FIXED-PRICE (APR 1984), ALTERNATE II; and contains FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) clause (R4, tab 35 at 918, 920-21).

On 18 July 2012, the Department of the Army, Army Contracting Command-Rock Island, issued Delivery Order No. BA01 under the IMOD I3MP contract on a firm-fixed-price basis for the performance of the I3MP Unified Capabilities Network Architecture upgrade at Fort Drum, New York (R4, tab 1 at 1-2). Pursuant to the delivery order, GDIT was to "provide all effort to engineer, furnish, install, secure, test, document, migrate and cutover a turn-key solution to upgrade the existing infrastructure and facilities at Fort Drum New York" (*id.* at 2). GDIT subcontracted with InterCounty Excavation (ICE) to perform the excavation work required by the delivery order (tr. 1/28, 186).

The delivery order and Fort Drum policy required GDIT, as the contractor, to obtain approved excavation permits from Fort Drum prior to performing excavation work (R4, tab 1 at 74, 134; supp. R4, tab 36 at 2). It also required, independent of the excavation permit process, that GDIT generate a "profile," which is a document that shows the depth and location of underground utilities in the area GDIT planned to excavate, and to submit the profile to Fort Drum for review and approval (R4, tab 1 at 134).

**Contractual Requirements Regarding Excavation Permits**

Delivery Order No. BA01 included as attachments a Performance Work Statement (PWS), and a Technical Data Package (TDP). Relevant to this appeal, the PWS contains a section entitled "Government Furnished Information" providing that: "Site-specific documentation represents the Government's best effort to capture existing requirements and conditions at time of collection and is believed to be accurate" (R4, tab 1 at 69). The PWS likewise contains provisions regarding Excavation Permits, specifically, section 4.2.2., Utilities, that provides:

> The contractor shall coordinate all utility locates and procedures in accordance with the Ft Drum Civil Site Design Guidelines[.] The contractor shall apply for, obtain, and comply with all local guidance and procedures concerning utility locates prior to digging at any location of the project area. Failure to obtain, and comply with all local guidance and procedures concerning utility locates prior to digging at any location of the project area will result in the contractor being responsible for the repairs to damaged utilities and reimbursement to the Government (or affected non-Governmental organizations) for loss of service due to the damaged utilities and will constitute contractor's negligence.

2

(R4, tab 1 at 74) The PWS also provides that the contractor will not be liable for damage to improperly marked or unmarked utilities when the contractor complies with the relevant procedures (*id*.).

Section 4.2.3, Permits, of the PWS provides:

> The contractor shall be responsible for obtaining all permits. The contractor shall apply for, coordinate and comply with local guidance and procedures concerning all permits. Procedures and contacts for obtaining permits shall be coordinated through the [Network Enterprise Center].

(R4, tab 1 at 74)

Also attached to Delivery Order No. BA01 was the "Technical Data Package for the Installation Information Infrastructure Modernization Program at Fort Drum, New York," dated 23 April 2012 (R4, tab 1 at 109). With respect to excavation permits, the TDP contains a section entitled "Site-Specific Requirements" (*id*. at 134). Subsection A-2.3 of the TDP, Excavation Permits, reads as follows:

> A copy of the Fort Drum Excavation Permit form is included in the Fort Drum Engineering Installation Package (EIP). The Contractor is responsible for adhering to the requirements listed on the permit form. Fort Drum will locate the Government-owned utilities as part of the permit process.

(*Id*.)

Paragraph 2.0 of the technical data plan, "OSP [Existing Outside Plant] Requirements," states that "OSP work shall comply with the *Technical Criteria for the Installation Information Infrastructure Architecture* and the *United States Army Information Systems Engineering Command (USAISEC) Outside Plant Design and Performance Requirements (OSPDPR)* (refer to Appendix J)" (R4, tab 1 at 120).

The TDP, Appendix J, References, states "The following publications are applicable to this TDP and/or have been cited herein. **J-1.0 U.S GOVERNMENT PUBLICATIONS**...y. USAISEC, TR No. AMSEL-IE-TI 09-001-7A, *United States Army Information Systems Engineering Command (USAISEC) Outside Plant Design and Performance Requirements (OSPDPR)*, February 2009" (R4, tab 1 at 163-64). The February 2009 USAISEC OSPDPR, paragraph 2.2.17, additionally provides that,

3

"[l]ocal post policy regarding in-ground installation of conduit and maintenance holes as stated in the site-specific SOR/EDP shall have precedence and shall override any stated directives contained within this document." (R4, tab 2 at 531) In addition, paragraph 3.4.1, Digging Permits, states that "[t]he contractor shall coordinate with the site DPW to schedule all excavation and obtain the required digging permits. Permission (approved digging permits) shall be obtained from the site prior to the start of any excavation and/or construction." (*Id*. at 541)

As noted in PWS section 4.2.2, the contract incorporates by reference the Fort Drum Civil Site Design Guidelines, which provide with regard to excavation permits that:

> An excavation permit is valid for up to 30 days. Additional work beyond the scope as depicted on the original map may be performed under the same permit, providing that the work occurs within the 30-day time frame, and is located in the same area as originally specified. An updated map must be provided to the Fort Drum contract officer prior to additional work being performed. A copy of an excavation permit form is provided.

(Supp. R4, tab 36, at 2)

In addition, the Fort Drum DPW Excavation Permits Policy states that:

> 5. The following stipulations are part of every excavation permit requested.
>
> ....
>
> ii. The excavator is responsible for outlining the anticipated excavation area prior to application with white markings.
>
> ....
>
> vii. Excavation permits are valid for thirty calendar days from the date issued.
>
> ....

4

x. The excavator is liable for repairs to underground utilities damaged by their work regardless of the condition or accuracy of above ground markings.

xi. The excavator is expected to hand dig five (5) feet either side of marked lines.

(R4, tab 4 at 633-34)

Excavation permits at Fort Drum are issued on a standard form, and each permit contains the same basic information, including the name of the excavator, a description of and map showing the area where work would occur, the proposed dig start date, and the date of the permit's approval (R4, tab 5; supp. R4, tabs 42, 45). Each permit issued contains the following standard language:

> The excavator shall...[i]dentify the exact location of excavation in white on the ground prior to requesting an excavation permit.... Throughout the excavation period, the excavator shall maintain and preserve all marked utilities. Before use of mechanized equipment in the tolerance zone, the excavator shall verify the precise location, type, size, depth and direction of such underground facility or its encasement, by hand digging, vacuum excavation accepted. The marked utilities are to be assumed to be plus or minus 5' either side of markings. Changes to, enlargement of sites and/or start delay over 30 days requires a new Excavation Permit. The undersigned have ensured existing underground utilities and other appurtenances have been identified prior to excavation. The excavator shall repair any damage to identified/located utilities and other appurtenances at no cost to the Government.

(R4, tab 5) Below this language is a list of fifteen "disciplines," or agencies, on Fort Drum, such as Master Planning, Engineering, and NECA Planning (*id.*).

In addition, but independent of the excavation permit requirements, contractors were also required to submit an excavation profile. Subsection A-2.2 of the TDP, Buried Infrastructure Path Profiles, states as follows:

> The Contractor shall establish final grades with the Fort Drum facilities engineers and shall meet their

5

requirements for right-of-way and depth of cover. As part of the digging permit process, the Contractor shall develop buried infrastructure path profiles that shall depict, at a minimum, the existing grade, proposed final grade, depth and elevation of proposed buried infrastructure, relationship to other buried utilities and at-grade structures (sidewalks, roads, etc.), cable vault locations, locations of concrete encasement, etc., along the buried infrastructure route. The facility engineers will provide the locations and depths of known existing infrastructure along the proposed routes.

(R4, tab 1 at 134) The profile provides a side-view of the underground utilities, and identifies their depths and relative locations as well as the contractor's proposed excavation path and placement of any proposed manholes (tr. 2/9; R4, tab 16 at 686).

**The Excavation Permit and Profile Process at Fort Drum**

In practice, GDIT's subcontractor, ICE, would mark the proposed route for its planned excavation at Fort Drum in white paint or with white flags (tr. 1/29). Mr. Carl Obert, the assistant site manager for ICE, would then submit a proposed excavation permit for approval at an automated kiosk located at Fort Drum (tr. 1/28-31). At the kiosk, Mr. Obert would input certain information regarding the planned excavation, and would draw a box or rectangle on an electronic map to designate an area covering the proposed excavation route (tr. 1/29-31). The significance of this box or rectangle on the kiosk permit application is at the heart of the dispute between the parties. As discussed in more detail below, GDIT contends that this box, which it refers to as the "work box" or "locate box" designated the excavation area under the permit and imposed a duty on the government to mark all utilities anywhere in the "work box" (tr. 1/31). The government contends that the box marked on the kiosk permit application was only to direct people to the general area of where to find the white lines marking the excavation path,[1] and to retrieve information about existing utilities from a geographic information system computer mapping program (tr. 2/57). The term "work box" is not defined or used in the contract, performance work statement, or any of the relevant documents (tr. 1/103-04, 2/63-65).

Once the proposed permit was submitted, a government representative from each discipline would visit the area marked on the permit, and identify and mark government-owned underground utilities (tr. 1/34, 137). Each discipline was to locate

---

[1] We take judicial notice of the fact that Fort Drum covers over 165 square miles, or roughly 2.5 times the area of Washington, DC.

6

the utilities specific to its area of expertise, after which it would approve the permit (tr. 1/33). Once the responsible discipline identified a utility, it would mark the location of the utility on the ground with paint or flags (tr. 1/34). These are known as "utility locate markings." Each type of utility was marked with a specific color, with communications utilities being marked in orange (tr. 1/34, 2/45). Relevant to this appeal, the Network Enterprise Center (NEC) was responsible for locating government-owned communication utilities (tr. 2/11). It located these utilities by the "induction" method which used an above-ground device that could identify and relay the presence of a utility without physically penetrating the surface (tr. 1/138, 2/81-82). Once all fifteen disciplines had indicated their respective approvals, an approval notice was generated and sent electronically to the requestor (tr. 1/33). When the requestor received the approved excavation permit, it could begin work (tr. 1/136, 140).

After approval of the excavation permit, the contractor could begin "potholing"[2] to confirm the location and depth of the underground utilities that were marked on the ground during the permit approval process (tr. 1/36-37, 206, 2/10). The utility locate markings were to be accurate within five feet of the actual location of the utility. The range (± 5 feet) is referred to the tolerance zone (tr. 1/37). If, while potholing, GDIT or its subcontractor was unable to locate a utility that had been marked on the ground, it would alert the government of the discrepancy (tr. 1/35-36, 2/108). Per Fort Drum policy and the terms of the contract, once GDIT determined the location and depth of the utilities in the excavation area, it was required to create a "profile" described above, which depicted the planned path of the new infrastructure in relation to the pre-existing infrastructure (R4, tab 1 at 134; tr. 1/135, 2/10).

GDIT's subcontractor, ICE, produced the profile initially. Once created, ICE would submit the profile to GDIT, which would in turn submit it to Fort Drum for approval (tr. 1/39-40). The NEC oversees the profile process at Fort Drum, and Mr. Lyle John Decillis, who is employed in the Plans, Architecture, Systems, and Operations Branch at the NEC, was primarily responsible for reviewing and approving proposed profiles (tr. 1/68, 2/13). The profile approval process is independent of the dig permit approval process, and approval of a profile does not constitute approval to excavate (tr. 2/10-13).

Prior to the start of work, GDIT provided ICE with all relevant information that the government provided to GDIT, including the solicitation, PWS, the TDP, and site requirements unique to Fort Drum (tr. 1/187-88). Whether ICE received it or not, Mr. Obert testified that he had never been provided a copy of the contract, the performance work statement, the Fort Drum Excavation Policy, or the Fort Drum Civil Site Design Guidelines (tr. 1/103-05). Instead, Mr. Obert learned the excavation

---

[2] "Potholing" involves digging a small hole to physically verify the locate markings.

7

permitting process by using the permitting kiosk at Fort Drum (tr. 1/31-32). He also relied upon his knowledge of the way things were done in state government projects and on other military bases (tr. 1/121). Mr. Kenneth Johnson, ICE's project manager, testified that he obtained his understanding of excavation permit process at Fort Drum from Mr. Obert (tr. 1/125-26, 138, 144, 176, 180).

**Excavation Permit 3309**

GDIT received several excavation permits during contract performance, including four permits covering or near the location of the utility strike: excavation permit 2668 (supp. R4, tab 42); excavation permit 3309 (the permit at issue in this appeal) (R4, tab 5); excavation permit 3323 (supp. R4, tab 45); and excavation permit 3582 (R4, tab 12). The process for obtaining excavation permit 3309 began with GDIT or ICE drawing a white line on the ground marking the route that it planned to bore under the roadway (tr. 1/51). As originally marked, the route started on the southeast corner of the intersection of Mount Belvedere Boulevard and Enduring Freedom Drive and went across Mount Belvedere Boulevard to maintenance hole (MH) 39, located on the southwest corner of the intersection (R4, tab 30 at 815; app. supp. R4, tab 29 at 2; tr. 1/86). After Mr. Obert submitted the permit request using the kiosk at Fort Drum, government personnel from the NEC and other entities at Fort Drum located and marked the underground utilities within the tolerance zone (± 5 ft.) of the excavation path marked by ICE with white paint (app. supp. R4, tab 10 at 2; R4, tab 1 at 134; tr. 2/49). Excavation permit 3309 was approved on 15 May 2014 (R4, tab 5 at 636).

On 19 May 2014, ICE potholed at the locate markings (tr. 1/55, 146; app. supp. R4, tab 33 at 4). With the information gained from potholing, ICE generated a profile showing the depth and relative location of the marked utilities (tr. 1/58-59; app. supp. R4, tab 29 at 2). The profile was approved by Fort Drum on or about 21 May 2014 (app. supp. R4, tab 29 at 2; tr. 1/59). GDIT photographed the excavation route and locate markings (tr. 1/77; R4, tab 8 at 650-51).

GDIT subsequently determined that an adjustment to the excavation pathway across Mount Belvedere was appropriate in order to move the western termination of the bore route from MH 39 to a proposed new maintenance hole, MH 42 (R4, tab 16 at 684-86; tr. 2/25-26). This adjustment shifted the location of the excavation path north of its original location, by approximately 20 feet[3] (R4, tab 30 at 815). The revised excavation path was within the "work box" drawn by ICE on excavation

---

[3] The original and revised bore paths are not parallel, so the distance between the paths varies across the intersection. The bore paths are 19' 6" apart at the point of the utility strike. (App. supp. R4, tab 24)

permit 3309, but was outside the tolerance zone (± 5 ft.) of the original bore path marked by GDIT or ICE in white paint (tr. 1/72-73, 2/49; R4, tabs 5, 16 at 684-86).

Prior to excavating along the revised pathway, ICE prepared a revised profile (R4, tab 16 at 686). To do so, it potholed at the locate markings surrounding the new route (tr. 1/65). However, the locate marks were the existing locate marks based on the original bore path roughly 20 feet south of the new route. Mr. Decillis testified that he informed GDIT's Mr. Maietta, that his crew had not marked utility locates in the proposed new excavation path because it was outside the tolerance zone (± 5 ft.) of the original excavation path and suggested that GDIT get a new excavation permit (tr. 2/21-27). Mr. Decillis followed-up the meeting with an internal government email, dated 28 August 2014, in which Mr. Decillis stated that "Cliff Lashway and I suggested to Mark [Maietta] that he put in another dig permit just for the corner.... They can start work in other parts of this run but because they are outside of the first dig permit area they should submit another dig permit for the corner." (R4, tab 13 at 662-63) Mr. Decillis testified that by corner he meant entire intersection (tr. 2/91-92). On 5 September 2014, GDIT submitted the revised profile to Mr. Decillis at the NEC for approval (R4, tab 16 at 682-83; tr. 1/65-68, 2/32).

On 11 September 2014, Mr. Decillis approved the profile for the new excavation path across Mount Belvedere (R4, tab 16 at 682). Mr. Decillis did not ask what permit covered the pathway depicted on the profile nor did he research whether an active permit covered the area; these were not tasks he customarily performed when reviewing profiles (tr. 2/87). Moreover, it appears that the different disciplines at Fort Drum were not consistent with their marking of utilities that were beyond the tolerance zone (± 5 ft.) from the originally marked pathway indicated by ICE with a white line on the pavement. For example, a natural gas line was marked in the middle of the intersection, even further from the original bore path than the revised bore path (tr. 1/64). Because of this, Mr. Obert and ICE incorrectly assumed that all utilities within the "work box" had been identified (tr. 1/73).

Hearing testimony established that ICE had previously requested new excavation permits when it modified an excavation route even though the new route was within the "work box" (tr. 1/118-19). For example, permit 3582 covered the same project area as excavation permit 3323, namely an area extending from Enduring Freedom Drive north up Mount Belvedere. Mr. Obert submitted a request for a new permit at the request of the government and because he recognized that the utilities had not been marked on the new excavation path despite the new path being located within what he considered to be the "work box" (tr. 1/118-19). Similarly, Mr. Obert obtained a new excavation permit, number 2624, that overlapped with permit 2561 because it was obvious to him that the new excavation route, behind a guardrail, was not marked,

9

even though the utilities were marked on the original excavation path in front of the guardrail (tr. 1/119).

A second error that contributed to the utility strike was that ICE was unable to locate the utility duct bank along the original bore path. Mr. Obert testified that ICE did not locate a marked communications duct bank when potholing along the original excavation path (tr. 1/79).[4] Although Mr. Obert testified that in such situations it was customary to notify the government about the problem and to work together to locate the utility (tr. 1/35-36), there is nothing in the record indicating that this was done. ICE subsequently moved the bore path to connect to a new maintenance hole and excavated without obtaining a new excavation permit and without working with the government to locate the marked, but unlocated, communications duct bank on the old excavation path. Although the Fort Drum NEC marked a communications duct bank as crossing Mount Belvedere Blvd. in a straight line, in fact, the duct bank shifted north, passing through the crosswalk as it crossed the intersection.

On 16 September 2014, while performing a directional bore at the location and depth specified in the revised profile, GDIT struck the previously un-located communications utility (R4, tab 17; app. supp. R4, tab 23; tr. 1/164, 296). The strike damaged the utility and resulted in a communications outage at Fort Drum (R4, tab 17; app. supp. R4, tab 23).

Two Site Incident Reports were generated describing the strike (app. supp. R4, tabs 24, 25). Mr. Dan Glynn, a government employee responsible for quality assurance, prepared a site incident report indicating that there were "reported outages of both dial tone lines and data circuits" (app. supp. R4, tab 24 at 1). Mr. Glynn's report noted: "After inspecting the locate markings it appears that the duct bank was not properly located, though complete responsibility is still being discussed at this time" (*id.*). Mr. Edgar Oalmann, a GDIT employee responsible for quality assurance, also prepared a site incident report (app. supp. R4, tab 25). Under the heading "Cause," Mr. Oalmann wrote, "The communications duct bank was not located properly and the bore head drilled thru the bottom portion of the concrete encased duct bank" (*id.* at 1).

**The Repair Work**

On 17 September 2014, Mr. Eric Ridgeway, GDIT's IMOD program manager, attended a meeting with GDIT and government employees, including the contracting officer, to discuss steps to repair the damage caused by the utility strike (app. supp.

---

[4] Testimony on this point is unclear as to whether ICE potholed in the location and was unable to find the duct bank or if the duct bank was not located because it was not potholed (tr. 1/79, 2/110).

R4, tab 28 at 1-2). In a meeting summary, Mr. Ridgeway reported that a government employee, Mr. Dave Davidson, "stated that the profile was wrong and that our contractor was on the mark" (*id.* at 1). Mr. Ridgeway added: "Our team has taken pictures of all the utility locate marks showing they were off as well. Early assessment indicates that this is not a GDIT fault item but due to the urgency and major outage we need to support this." (*Id.*) On 18 September 2014, the contracting officer, Mr. Nathan Acree, Jr., signed a Memorandum for the Record determining that repair work to fix the damaged utility was within the scope of the delivery order (R4, tab 23 at 709). With respect to liability, this Memorandum stated, "Initial inspection has shown that the Government has some liability in the incident, but it is still to be determined the extent of where fault lies" (*id.*). On that same date, GDIT and the government executed Modification No. 10 to the delivery order, which instructed GDIT to repair the damaged utility (R4, tab 22 at 707-08).

Modification No. 10 contemplated that GDIT would submit a Request for Equitable Adjustment (REA) – "The purpose of Modification 10 to Contract W91QUZ-06-D-0025 / BA 01 is as follows: ....To acknowledge that as a result of performance of this restoration work a reasonable request for equitable adjustment will be considered" (R4, tab 22 at 708).

**GDIT's Request for Equitable Adjustment and Claim**

GDIT successfully performed the repair work authorized by Modification No. 10 (tr. 1/167). As a result of this repair work, GDIT asserts that it incurred approximately $623,855.99 in costs (R4, tab 30 at 779; tr. 1/214). On 4 December 2014, GDIT submitted an REA requesting compensation for the remediation work it performed following the utility strike (R4, tab 27). The REA asserts that GDIT followed proper procedures and the terms of the contract, and that the strike and resultant damage were caused by the government's failure to properly mark the communications utility (*id.* at 726-30). On 2 April 2015, approximately four months after GDIT submitted its REA, the government denied the REA (R4, tab 28). The contracting officer stated that "GDIT did not request a revised excavation permit after it decided to deviate from the earlier approved pathway to MH 39" (*id.* at 766). "Had GDIT re-submitted a permit application with the revised pathway to MH 42 all of the applicable departments would have had to re-locate their utilities" (*id.*). Had the government "re-located" its utilities, the contracting officer concluded that "the communications duct bank would have been located during the re-permitting process" (*id.*).

Following the REA denial, GDIT submitted a certified claim to the contracting officer on 31 July 2015 (R4, tab 30). The claim requested a total of $623,855.99, plus interest, for the repair work authorized by Modification No. 10 (*id.*). On 24 March 2016, the contracting officer issued a final decision denying GDIT's claim (R4, tab 33 at 840).

11

The final decision denied the claim for "failing to obtain a new excavation permit outside of the required 30 day time period, failing to obtain a new excavation permit after changing the original work route, and failing to take photographic evidence that would have identified the locate markings" (*id.*). On 13 June 2016, GDIT timely filed its appeal with this Board, appealing the contracting officer's denial of its certified claim and requesting $623,855.99 in costs plus attendant interest. The Board conducted a hearing in this matter on 7 and 8 June 2017 (tr. 1/1-2, 2/1-2).

## DECISION

The issue in this appeal is which party is liable for the utility strike. The terms of the contract provide that GDIT is required to comply with the Fort Drum excavation policies and permit requirements. As part of the application process for permit 3309, ICE first marked a bore route in white paint across Mount Belvedere Blvd. south of the crosswalk at the intersection with Enduring Freedom Dr. It subsequently applied for an excavation permit and, in the application process, identified the general work area with a "work box" in the permit application process at a kiosk at Fort Drum. While ICE was of the belief that the disciplines at Fort Drum would mark all utilities in the work box, in fact, the Fort Drum personnel only committed to mark utilities along the excavation path ICE had marked with a white line. The contractual documents require GDIT to comply with the Fort Drum excavation permit which explicitly requires the contractor to mark the precise excavation path. By contrast, none of the relevant documents refer to the "work box" that GDIT contends delineated the approved area for excavation. Evidence presented at the hearing indicated that GDIT's chief witness, Mr. Obert, had never seen the contract, PWS, TDP or other relevant documents. In addition, Mr. Decillis testified that he informed GDIT's Mr. Maietta that GDIT should request a new building permit for the changed excavation bore route, because the NEC had only marked utilities within the ± 5 foot tolerance zone of the white line. This testimony was supported by a contemporaneous email and we find his testimony to be credible. Moreover, GDIT was aware that the NEC had marked a communications locate in the area of the original bore path, and that GDIT had not located the utility. Once GDIT moved the bore path by 20 feet, it should have been aware that there was a duct bank that it had not located by potholing somewhere in the area and known that it was at risk excavating outside the ± 5 foot tolerance zone.

GDIT asserts that the government is liable for the utility strike because of a breach of contractual obligations and breach of an implied warranty against defective specifications (app. br. at 20-32), a differing site condition (*id.* at 32-36), because the government cannot prove that it would have found the utility if GDIT had submitted a new excavation permit (*id.* at 36-38), and because government remained silent in the face of GDIT's actions (*id.* at 38-41). The breach of contractual obligations, defective

12

specification, and differing site condition theories are each premised upon the government being required to locate utilities outside the tolerance zone but within the "work box." *See, e.g., ADT Construction Group, Inc.*, ASBCA No. 57322, 15-1 BCA ¶ 35,893 at 175,470 (one of three elements appellant must prove to recover on an equitable adjustment claim is that "the government did something that changed the contractor's costs for which the government is liable"); *American Ordnance LLC*, ASBCA No. 54718, 10-1 BCA ¶ 34,386 at 169,780 (the contractor must first "establish[] it substantially complied with Government plans and specifications") (quoting *SPS Mechanical Co.*, ASBCA No. 48643, 01-1 BCA ¶ 31,318 at 154,692); *Columbia State Bank*, ASBCA No. 59531, 16-1 BCA ¶ 36,399 at 177,454 (one of the four elements of a Type 1 differing site condition claim is that the contractor must demonstrate that the "condition indicated in the contract differs materially from those actually encountered during performance") (quoting *Optimum Services, Inc.*, ASBCA No. 58755, 15-1 BCA ¶ 35,939 at 175,654).

The PWS and TDP both require GDIT to comply with local guidance and procedures for locating utilities prior to digging (R4, tab 1 at 74, 134). The Fort Drum excavation permit policy provides that the "excavator is responsible for outlining the anticipated excavation area prior to application with white markings" (R4, tab 4 at 633). The excavation permit further provides that "marked utilities are assumed to be plus or minus 5' either side of markings" (R4, tab 5). Moreover, the government presented credible witness testimony that GDIT should only assume that utilities were located within the five-foot tolerance zone around GDIT's marked bore path (tr. 2/27, 49).

Nowhere in the relevant documents is there any mention of a work box or locate box or an obligation for the government to locate all utilities within the work box. Rather, testimony indicated that the box drawn on the electronic permit application was simply to direct Fort Drum staff to the general location of the excavation route marked with white paint (tr. 2/57). This is understandable given the fact that Fort Drum covers over 165 square miles. GDIT asserts that the "work box" drawn by the applicant appears on the issued excavation permit, and thus, is incorporated in the permit (app. reply at 14). However, the mere fact that an illustration of the "work box" was on the dig permit does not create an obligation for the government to locate the utilities in the work box, and does not override the explicit text of the excavation permit and its notice that there is a tolerance zone of ± 5 feet.

GDIT relies upon the testimony of Mr. Obert and Mr. Johnson to establish the government's obligation to mark all utilities within the work box. Neither had adequate knowledge to testify persuasively on the subject. Mr. Obert had not read the PWS, TDP, or the Fort Drum excavation permit guidance. Mr. Obert apparently obtained his knowledge of the permitting requirements from his experience of the way things are done on other projects (tr. 1/121). Mr. Johnson obtained his knowledge of

13

the Fort Drum permitting process from Mr. Obert (tr. 1/176, 180). GDIT additionally asserts that government's interpretation of the excavation permits, and the need to obtain new permits when the excavation path is shifted is unworkable because it would be "untenable and impractical" to require a new permit "each time a route is slightly revised or shifted" (app. reply at 13). However, this misstates the government's position which recognizes a 10-foot wide tolerance zone within which the contractor can assume the utilities are marked.

GDIT additionally relies upon statements made immediately following the utility strike as evidence of government fault. However, none of the statements conclusively admit fault, and simply indicate that there "appears" to be fault on the part of the government. For example, Mr. Glynn wrote that "it appears that the duct bank was not properly located, though complete responsibility is still being discussed at this time" (app. supp. R4, tab 24). Similarly, Mr. Acree, the contracting officer, noted that "[i]nitial inspection has shown that the Government has some liability in the incident, but it is still to be determined the extent of where fault lies" (R4, tab 23 at 709). Even if a government employee had admitted fault, this would not trump our interpretation of the terms of the contract.

With regard to GDIT's argument that the Army cannot prove that it would have found the utility if GDIT had submitted a new excavation permit, this speculation is irrelevant. GDIT is the appellant here and it is GDIT's burden to prove that the government would not have marked the communication duct in response to a new permit request. GDIT has not met that burden.

GDIT's final argument, that the government improperly remained silent when it knew that GDIT was planning to excavate on a new bore path and that GDIT did not share in the government's understanding of the need for a new excavation permit also fails. As noted above, Mr. Decillis testified that he informed GDIT that it needed to obtain a new excavation permit for the revised bore path (tr. 2/21-27). In addition, Mr. Decillis' testimony is corroborated by a contemporaneous email message stating that he had informed GDIT's Mr. Maietta that he should get a new excavation permit (R4, tab 13 at 663). We find this testimony credible and find that the government did not remain silent in the face of knowledge that GDIT interpreted the contractual provisions differently, but instead, told GDIT to get a new excavation permit.

GDIT questions Mr. Decillis' testimony because in his email, he stated that GDIT needed a new permit for the "corner" rather than the bore path. Mr. Decillis testified that by corner he meant the intersection (tr. 2/91-92).

14

Having found that the government was not obligated to locate utilities beyond the tolerance zone of the original marked bore path, we need not reach the government's argument that the excavation permit had expired.

CONCLUSION

For the reasons stated above, the appeal is denied.

Dated: June 26, 2018

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60625, Appeal of General Dynamics Information Technology, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals